Argued February 20, affirmed April 1, 1974

TRUDEAU, *Appellant, v.* WEYERHAEUSER
COMPANY (No. 73 2566), *Respondent.*

520 P2d 472

*Donald R. Wilson,* Portland, argued the cause for appellant. With him on the briefs were Pozzi, Wilson & Atchison, Portland.

*J. Laurence Cable,* Portland, argued the cause for respondent. With him on the brief were Robert E. Joseph, Jr., Ridgway K. Foley, Jr., and Souther, Spaulding, Kinsey, Williamson & Schwabe, Portland.

Before SCHWAB, Chief Judge, and LANGTRY and TANZER, Judges.

LANGTRY, J.

Claimant, the wife of a deceased workman, seeks benefits under the Workmen's Compensation Law on account of death and alleged preceding permanent total disability of the deceased. She appeals from adverse decisions successively by the hearing officer, the Workmen's Compensation Board and the circuit court. The hearing officer wrote an opinion which contained a lengthy summarization of the evidence, an analysis thereof, and the applicable law. That opinion was adopted by the Board and was found to be correct by the circuit court.

Deceased suffered a back injury in 1967 while employed by Weyerhaeuser Company, the defendant. He received compensation and underwent low back surgery (L-3 and L-4) in which disc material was removed. A similar operation at the L-4 and L-5 level had been performed upon him in 1949 as the result of another industrial injury. After recovery in 1949 he had continued employment which featured heavy lifting with no ill effects until the 1967 injury which was

incurred while deceased was lifting 100-pound bags to an overhead level. He left the hospital some eight days after the 1967 surgery, was seen in the surgeon's office several times, and finally went to the Physical Rehabilitation Center, which concluded he could do light work. His neurosurgeon, Dr. Serbu, and the rehabilitation agency agreed that he could not continue heavy work in view of his condition and the fact that he was 59 years of age. Deceased desired to retire, did so and was awarded permanent partial disability, 25 per cent unscheduled and 20 per cent scheduled, for his left leg. In 1971 deceased reported back to Dr. Serbu complaining of pain in his back and in the anterior aspects of his right thigh. A myelogram revealed a bulging disc in the L-4 and L-5 area. One blood chemistry test showed that he had a low white blood cell count and another showed the white cell count to be in normal limits. Between 1967 and 1971 when he had had eye surgery a low white cell count had also been noticed.

The claimant in her reply brief states she is simply contending that the L-4 and L-5 disc problem was a continuation of the injury from the industrial accident, that before the deceased could become a suitable surgical candidate to have the bulging disc surgically repaired his blood condition evidenced by the white cell count had to be worked out, that in working out this condition Dr. Serbu and other doctors suspected cancer, that an erroneous diagnosis of one type of cancer was made, resulting in treatment which was contraindicated for the type of cancer he really had, and that treatment further lowered the white blood cell count which in turn reduced deceased's resistance to disease and when he contracted pneumonia the chain of events caused his death.

An autopsy performed upon the deceased showed that he had multiple myeloma.[1] Dr. Pirofsky testified to an educated guess that the multiple myeloma would have resulted in death within a year if he had not died of pneumonia. He said that it was possible death could have come within a month or that the deceased could have lived for a substantially longer period of time than one year. It was clear from the autopsy report that the cancerous cells had spread widely throughout deceased's body.

■ Claimant has the burden of proving her case by a preponderance of the evidence. *Swanson v. Westport Lumber Co.,* 4 Or App 417, 479 P2d 1005 (1971). This means she was required to produce medical evidence which meets the test, indicating that death came about through the compensable injury.

"It is, of course, the settled rule that

" '* * * where injuries complained of are of such character as to require skilled and professional persons to determine the cause and extent thereof, the question is one of science and must necessarily be determined by testimony of skilled, professional persons. * * *' * * *." *Uris v. Compensation Department,* 247 Or 420, 424, 427 P2d 753, 430 P2d 861 (1967).

■ The neurosurgeon's, Dr. Serbu's, testimony was crucial to this proof. When the myelogram in 1971 revealed a bulging disc in the L-4 and L-5 area, it is

---

[1] Stedman's Medical Dictionary 1045 (2d unabridged L ed 1966) defines "multiple myeloma" as

"an unusual disease that * * * is ordinarily regarded as a malignant neoplasm that originates in bone marrow and involves chiefly the skeleton; the clinical features are attributable to the sites of involvement * * * characterized by numerous diffuse foci * * * in bone marrow of various bones, especially the skull, and occasionally in extraskeletal sites * * *."

claimant's contention that Dr. Serbu and his associates intended to perform, or should have performed, surgical procedures thereon to correct the difficulty and that it was an outgrowth of the 1967 injury. Dr. Serbu testified directly contrary to this conclusion. He stated that although there was a bulge in that disc area he did not then believe it was the cause of the deceased's primary complaint of pain in the anterior aspects of his right leg. He noted that deceased also complained to his associate, Dr. Hockey, that the entire leg was numb when he was first hospitalized in 1971. Dr. Serbu repeatedly testified that pain so located, or such numbness, could not come from the defect in the L-4 and L-5 area. This testimony, the claimant asserts, is incredible primarily because Dr. Serbu had made other inconsistent statements. What happened in this regard is that Dr. Serbu arranged for the deceased to be transferred from the Sacred Heart Hospital in Eugene to the Good Samaritan Hospital in Portland when he and his associates in Eugene were unable to diagnose the deceased's difficulty in 1971. A letter he wrote then recommended to defendant that it pay the costs involved, saying the difficulty was referrable to the 1967 industrial injury. When he was confronted with this, his testimony explained:

"* * * Without question, my sympathies were much more with Mr. Trudeau as a human being, lying in bed or the bedside, than with any industrial giant like Weyerhaeuser Company. There's no question about it. I wanted to see is there anything we can do to get this man well. The transfer from Sacred Heart to Portland is not cheap. Further hospitalization and further evaluation is not cheap, and here is a family with the father retired, in his '60's, telling me that their insurance would likely not cover this unless it was industrial. I felt I'd stretch my imagination to any extent to see, gosh, let's get

this industrial giant to cover this man and help the Trudeau family in their sad situation.

"* * * * * *

"* * * I wrote this letter after two weeks of extensive investigation when I drew a blank as to the diagnosis, had a very sick man, a family that said, goodness, that's more and more expense. I said, well, let's see if we can get Weyerhaeuser to help us, and we'll confirm a diagnosis. My thought was that if they confirm a diagnosis that was different than industrial injury the facts would speak for themself, that if this man was shown to have cancer that that is the time that one can positively and unequivocally state that this is truly not industrial related, and if per chance I was wrong and did actually miss a herniated disc that again the facts would speak for themselves * * *."

The hearing officer listened to this testimony and searching cross-examination of Dr. Serbu, as well as Mrs. Trudeau's testimony about deceased's having insurance which may have covered the expense, or some of it. He obviously concluded that the inconsistencies in Dr. Serbu's statements were satisfactorily explained and that Dr. Serbu's testimony was entitled to credibility. So also did the Workmen's Compensation Board and the circuit judge. We agree. *Cf. Ryf v. Hoffman Construction Co.*, 254 Or 624, 632, 459 P2d 991 (1969); *Swanson v. Westport Lumber Co.*, supra, 4 Or App at 420; *Moore v. U.S. Plywod Corp.*, 1 Or App 343, 462 P2d 453 (1969). Dr. Serbu, at the critical stages of the treatment this case is concerned with, was the treating doctor. His testimony was so convincing that it carries the preponderance of all of the evidence. His final conclusion was that the death was not compensably related to the industrial accident of 1967. Our de novo review of the extensive evidence leads us to the same conclusion.

The claimant also contends, despite the assertion of the one simple claim she sets forth in the reply brief, that the deceased was permanently and totally disabled on or before the date of his death from his injuries and the attendant pain and disability resulting from the industrial accident. What we have already said above would appear to dispose of this contention. However, the argument claimant advances in this regard is substantially that between May 1, 1968 (which was the time of Dr. Serbu's last examination after the 1967 surgery) and the deceased's admission to Sacred Heart Hospital on January 3, 1971 the deceased had increasing disability which was principally caused by extreme pain and discomfort. The evidence leads us to conclude that the principal pain and disability which the deceased suffered during this period of time was more likely attributable to the developing multiple myeloma than it was to any result of the injury which was repaired in the 1967 surgery. The award of partial permanent disability after deceased's release from the Physical Rehabilitation Center appears to have adequately covered the industrial accident related disability.

Affirmed.